IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 23, 2017 Session

## GREAT AMERICAN OPPORTUNITIES, INC. v. JAMES A. BRIGMAN

**Appeal from the Chancery Court for Davidson County**
**No. 11-1117-IV     Russell T. Perkins, Chancellor**

_____

### No. M2016-02035-COA-R3-CV

_____

This is a breach of contract action in which the plaintiff employer filed suit against its employee, claiming that he was liable for balances on his commission and sales accounts. Following a bench trial, the court ruled in favor of the employee and ordered the employer to direct the redemption of his stock held in the parent company. We reverse, in part, and hold that the parent company is not obligated to redeem the stock and that the employer is also without the requisite authority to direct redemption. We affirm the judgment in all other respects.[1]

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed in Part, Affirmed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J. and ANDY D. BENNETT, J., joined.

Paul S. Davidson, Laura P. Merritt and William Randall O'Bryan, Jr., Nashville, Tennessee, for the appellant, Great American Opportunities, Inc.

James A. Brigman, Lewisville, North Carolina, pro se.

### OPINION

### I.     BACKGROUND

Great American Opportunities, Inc. ("GAO"), founded in 1974, provides services and products to promote fundraising activities for schools and civic organizations. GAO is a subsidiary of Southwestern/Great American, Inc. ("Southwestern"), a separate legal

_____

[1] The case under submission presents similar issues addressed by this court in *Great American v. Patterson*, No. M2016-02034-COA-R3-CV, which we decided in a separate opinion after denying motions for consolidation on appeal.

entity and a Tennessee corporation. GAO employs commissioned sales representatives who work with individuals within participating schools and organizations to promote fundraising efforts. James Brigman ("Employee") worked for GAO as a sales representative from February 2003 through March 2, 2011.

GAO claimed that it provided Employee with a contract entitling him to a guaranteed draw plus earned commissions for his first two years of employment. GAO asserted that upon the expiration of his initial two-year term, Employee would then be entitled to an unguaranteed draw against earned commissions paid in accordance with a yearly Pay Plan. Employee would also then be responsible for certain business expenses maintained on an open account, referred to by the Parties as the "8000 account."[2] Further, Employee was also then liable for his balance on an open commission account that documented cash advances provided in excess of his actual earned commissions – referred to by the Parties as an overdraw.

The contract at issue provided, in pertinent part, as follows:

Compensation

(a)     For all services rendered by Employee under this Agreement, [GAO] shall compensate him/her in accordance with the Compensation Schedule which is attached hereto as Exhibit A, and which shall be deemed for all purposes to be an integral part of this Agreement.

(b)     Each fiscal year during the term of this Agreement, [GAO] shall cause to be executed in writing a new Compensation Schedule and Sales Representative's Pay Plan, effective July 1 of the new corresponding year, indicating the amount of compensation and the method for payment of said compensation for the services of Employee during the following fiscal year beginning July 1st. The new Compensation Schedule shall be considered a part of this Agreement and shall be known as Exhibit A for the corresponding year. In conjunction with each new fiscal year, [GAO] will advise Employee of *his/her applicable Pay Plan to be set forth in a written Notification given in accordance herewith comparable in form to the Addendum made a part hereof.*

* * *

---

[2] The 8000 account documented advances and business allowances made for merchandise, promotional aids, marketing pieces, and mailings used for the promotion of fundraisers.

Modification and Waiver of Breach.     No waiver or modification of this Agreement shall be binding unless it is in writing, signed by the parties hereto.  No waiver of a breach hereof shall be deemed to constitute a waiver of a further breach, whether of a similar or dissimilar nature.

* * *

Entire Agreement.  This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all prior discussions, representations and preliminary agreements, whether written, oral or implied.  This Agreement will not be amended or modified except in writing executed by the parties.

(Emphasis added.).  A Notification of Pay Plan, dated February 14, 2003, was attached to the contract and signed by the Parties.  The document provided, in pertinent part, as follows:

Exhibit A
Notification of Pay Plan

* * *

**Compensation in First Year**

> **Monthly Compensation**:  Employee will receive monthly compensation of $7,292 for the term [beginning February 17, 2003, and ending February 16, 2004].

> **Bonus Compensation Opportunity**:  For any business booked over the $300,000 net wholesale target outlines above, [GAO] will pay [Employee] a bonus of 10% of the excess net wholesale.  The bonus will be accrued at the time the net wholesale is recorded on the books of the company and payable to [Employee] no later than 30 days after the end of the season in which the bonus compensation was accrued.

**Compensation in Second Year**
In the event that [Employee's] Employment Agreement is renewed for the year following the term of his Notification, [Employee] will continue to receive this monthly compensation.  However, in that year, $2,500 of the monthly compensation will be considered salary.  The remainder of the

monthly compensation will be a guaranteed draw against commissions, bonuses and allowances earned. If aggregate commissions, bonuses and allowances earned as outlined below exceed the aggregate monthly compensation amounts, [GAO] will pay [Employee] excess amount. If, however, the amounts earned do not exceed aggregate monthly compensation amounts, the shortfall (overdraw) will NOT be due and payable to [GAO].

For all lines of business except Magazines, [Employee] will [] *earn commissions, bonuses and allowances* according to the Company's Experienced Pay Plan in effect at that time. For Magazines, [Employee] will earn commission of 25% of aggregate base wholesale. [Employee] will also earn a bonus of $1.00 for each subscription sold in excess of a base subscription amount to be determined at the time the Employee's employment with [GAO] commences.

(Emphasis added.). The Pay Plans referenced in Exhibit A were not signed by the Parties but were mailed to Employee. The Pay Plans contained the following general terms that remained unchanged throughout Employee's tenure with GAO:

7.    Compensation And Draw. [Employee] will receive a monthly compensation, payable semi-monthly, a portion of which may be a base compensation with any remaining amount to serve as an advance or a "draw" against commissions and bonuses earned during the fiscal year as defined in the new hire and experienced sections of this pay plan. For each fiscal year, [Employee]'s applicable Notification of Pay Plan will also note his/her compensation and draw.

8.    Adjustments To Compensation And Draw.    [GAO] may at its discretion adjust or discontinue [Employee's] monthly compensation at any time if, in the opinion of [GAO] management, [Employee] has not performed at an acceptable level.

9.    Draw In Excess of Commission. If at any time the draw paid to [Employee] exceeds commissions earned by more than the amount approved by management, [Employee] may not be paid any additional draw until the excess amount is within approved limits. However, if such a draw is allowed, [GAO] may, at its option, recover the entire aggregate excess draw above commission and bonuses as, among other things, a debt on open account or offset such aggregate excess draw against bonuses, compensation and/or commissions, as the case may be.

* * *

14.    [Employee's] 8000 Account.    [GAO] will provide [Employee] monthly invoices and statements detailing charges to [Employee's] account with [GAO] (the "8000 account"). All charges to [Employee's] account will be reconciled and paid each month. [Employee] must notify Customer Service of billing errors within 60 days of receipt of the applicable monthly statement. Failure to do so constitutes acceptance of charges invoiced.

* * *

17.    Year-End Settlement of Accounts.    All amounts due [GAO] at fiscal year-end may be withheld from bonuses and any other compensation amounts that would normally be paid to [Employee] by August 31 following the close of that fiscal year. These amounts due include but are not limited to draws paid in excess of commission earned, advances in excess of expense allowance earned and charges made to [Employee's] 8000 account. If these compensation amounts due to [Employee] are not sufficient to cover amounts due to [GAO], the excess is due and payable . . . by August 31 following the end of the fiscal year. Or [GAO] may, at its option, offset such amounts as set forth in Paragraph 9.

According to GAO, Employee was not responsible for his 8000 account or any overdraw for his first two years of employment based upon his specific offer of employment. Beginning in 2005, GAO provided Employee with invoices documenting his 8000 account balance. Employee never reconciled his 8000 account as provided for in the yearly pay plans; however, he made a payment of $11,000 on the account in June 2008. GAO also withheld some of his earnings, referred to as "C-Prize" money, in an attempt to reconcile his account liability. Employee resigned on March 2, 2011, with an outstanding overdraw of $91,707.92 on his commission account and $39,958.69 on his 8000 account.

GAO filed suit for breach of the employment agreement and quantum meruit. GAO alleged that Employee was liable for the balance on the commission account and the 8000 account. Employee denied liability, claiming that his payment of $11,000 was made under duress and that he had been advised that he would never be held liable for his balances held on his commission or 8000 accounts. He filed a counter-complaint, in which he asserted, inter alia, claims of fraud, promissory estoppel, negligent misrepresentation, conversion, unjust enrichment, intentional interference with prospective business relationships, and violations of the Tennessee Consumer Protection

Act and the Tennessee Securities Act of 1980. His claims related to promises made to him upon his hiring and his participation in the company stock program. He also asserted that GAO refused his demand "for the value of his investment" in the stock plan and also refused to provide an accounting sufficient to enable him to determine the value of his investment.

The case proceeded to trial in August 2013. James Ring testified that he supervised Employee for approximately five to eight years when they both worked at Quality School Plans ("QSP"), a similar fundraising business.[3] Mr. Ring later joined GAO in 2002 to start a magazine division. He recalled initially working with Rob Corley, Neil Arnold, Jean Laise, and Kurt Gengenbach, all former QSP employees who joined GAO to develop the magazine division. He stated,

> [Ms. Laise] helped me on the recruiting side. She would – once we agreed we were going to bring somebody to Nashville and I talked to them, we had a phone interview. Ms. Laise would make their flight arrangements, their hotel arrangements, that sort of thing.
>
> And then with her financial background, once we looked at the numbers, she would put together for me a suggested pay plan based on what they were selling and making at QSP, what they were receiving in terms of any expenses and so forth. Then she would help do all those calculations so that we would know what would be a reasonable offer to make sure these people would be whole when we were giving them guarantees, so she was involved in that part of it too.

Mr. Ring testified that he was initially in charge of recruitment and interviewing prospective sales representatives for the new division. He explained that they were respectful of those like Employee, who came from QSP with prior contractual obligations. He stated,

> [W]hen we hired an employee, we told them they could not, according to their contract with QSP, work in their territory for a 12-month period. They could not disclose to us a list of their accounts. They could not basically call on those schools.

Accordingly, they allowed such representatives to either cover an existing GAO territory or to train a current GAO representative to work in the magazine division.

---

[3] Mr. Ring is currently the executive vice president and director of sales for QSP, Canada, which is now a subsidiary of GAO.

Relative to salary and incentives, Mr. Ring stated that prospective employees coming from QSP were offered a $30,000 salary, a 25 percent commission on magazine sales, and a car allowance similar to what they received at QSP. He noted that the 25 percent commission was an enticement for those already in the business who were typically only provided a 17 percent commission. He explained that they provided a guaranteed income to Employee and others hired to develop the magazine division because the new hires had to leave their existing territory. He stated,

> [T]he first year the guarantee was basically the salary. In the second year, it was a combination of a salary and an advance against commissions. So that if they sold more than we were actually advancing them, they would receive that additional money. If they sold less, we would write it off.

> So, in effect, they had two years of their income guaranteed, one of which when they were back in their territory.

He agreed that these new hires, including Employee, were also not charged the cost of doing business through the 8000 account. He provided that their income was no longer guaranteed after the first two years but that the new employees could still realize a high income because of GAO's high commission percentages. He believed that Employee's responsibility for his 8000 account balance and other expenses would have been discussed at the initial training on administrative procedures. He provided that Employee would have also been advised of the parameters of the C-prize program.[4]

Mr. Ring agreed that Employee never received another Pay Plan comparable in form to the one provided with the initial Employment Agreement. He further stated that the yearly Pay Plans provided to Employee were identical to those provided to all employees and that portions of those plans did not apply to Employee, who received a higher commission, additional incentives, and was not responsible for his 8000 account balance. He acknowledged that Employee's lack of 8000 account liability was a verbal agreement not reduced to writing. He insisted that despite this fact, the Pay Plans applied to everybody "with the exception that these magazine veterans[, like Employee,] received a higher commission on magazines, they received a car allowance instead of a two and a half percent expense allowance, and they received a salary. Otherwise, this did apply." He denied ever advising Employee that he would never be responsible for his 8000 account balance. He explained,

---

[4] The C-prize program was a cash incentive program that allowed the sales representative to credit his or her 8000 account in lieu of using the prize program provided by GAO. Employees could also receive cash if his or her 8000 account was current.

When we hired these people [to develop the magazine division], it was always our long-term intention to bring everything together because we hired people – we also bought a couple companies in between. We were going to merge everything. But these were recruitment enticements, if you would, to make sure these people came.

We told them that they would – that that policy of the 25 percent would always apply to them. Then eventually we would change the compensation system for the [existing] Great American employees. That's a poor way of phrasing it because they were Great American Employees too.

But for the non[-]magazine people, . . . as they grew their magazine sales and got to a certain level, then they would [have] been eligible for salaries as well. They would be eligible to have the commission rate for magazines go to 25 percent and they would be eligible to have the car allowance, again, if they reached a certain minimum. I think we merged all that together, I don't know, maybe '08, '09, '10.

He confirmed that the 2008-2009 Pay Plan contained the revised salary chart and the current magazine sales commission structure.

Mr. Ring agreed that GAO allowed its employees to accumulate balances on the 8000 accounts and did not require immediate payment in full. However, GAO eventually withheld commissions or reduced commission draw amounts in an effort to reconcile the accounts when necessary. GAO also offered special plans and incentives to assist representatives in reconciling balances held on the commission and 8000 accounts.

Mr. Ring recalled that Employee's draw was reduced on more than one occasion. However, Employee requested a draw increase of approximately $1,500 per month in December 2010 based upon his increased sales. Mr. Ring approved an increase of $500 per month. He stated that with the exception of Employee's first two years of employment, Employee did not have a set salary from year to year. He provided that Employee's manager was responsible for making that determination based upon the terms of the annual Pay Plans.

Mr. Ring testified that Brian Patterson,[5] another sales representative, covered Employee's sales territory for a year while QSP's covenant not to compete was still valid. He explained that Brian attempted to maintain Employee's relationship with his contacts

---

[5] Brian Patterson is related to Brad Patterson, the defendant-employee in *Great American v. Patterson*. We will refer to him as "Brian" in an effort to avoid confusion.

while Employee was unable to service his own territory. He agreed that Employee reported that Brian failed to adequately maintain the sales territory in his absence.

Carol Costa testified that she has been employed by GAO as a compensation manager since 1991. She is responsible for calculating sales, bonuses, and commissions for all representatives and providing monthly commission reports and 8000 account statements to representatives. She also communicates with the representatives and implements changes in draws against commissions when necessary. She provided that a representative's actual pay was determined by the manager. She explained,

> At the beginning of each school year, the manager will get with the sales representative and go over the amount of projected sales for that year, contracts in-house and what those net sales should be. From that net sales figure, they will calculate a monthly draw amount that that salesperson can receive based on what their sales earned for that year are going to be in commissions earned.

She stated that she provided the representatives with new Pay Plans every year and acknowledged that these plans were not signed by the individual representatives. She explained that GAO had attempted to require a signature on each Pay Plan in prior years but that employees routinely failed to return the documents.

Ms. Costa confirmed that Employee was paid in accordance with his initial Notification of Pay Plan for the first two years of employment with GAO and that he was not responsible for 8000 account expenses for those first two years.[6] He was also not paid in accordance with the subsequent Pay Plans provided to all sales representatives because he received a guaranteed salary and a car allowance program, among other things, as employment incentives. She acknowledged that neither the terms of the car allowance program nor the 8000 account arrangement were evidenced in writing. She explained that the Pay Plans set forth the method of payment, not necessarily the amount of payment each representative would receive. She stated that the 2008/2009 Pay Plan provided a salary component but again agreed that these provisions did not necessarily apply in total to Employee. However, the commission rate on magazine sales listed was applicable to him and other representatives.

Ms. Costa confirmed that Employee had an outstanding balance of $91,707.92 on his commission account and $39,958.69 on his 8000 account. Employee never contacted her concerning his balances, objected to the total amount owed, or objected to his periodic draw reductions. She agreed that the Pay Plans provided that the 8000 account

---

[6] GAO did not seek reimbursement for 8000 account expenses for the first three years of employment.

would be reconciled and paid each month. She noted that the Pay Plans also permitted GAO to maintain 8000 account balances as an open account and carry the balance forward. She acknowledged that other than payroll deductions, Employee was not required to pay his 8000 account balance until he made a one-time payment of $11,000 in June 2008. Employee also never reconciled his commission account; however, the Pay Plans permitted GAO to carry the balance forward each year. Ms. Costa acknowledged that Southwestern has offset amounts paid into the stock program by an employee's 8000 or commission account balance upon his or her departure from GAO.

Tracy Armstrong testified that she has been employed by GAO as the director of customer care for approximately 15 years. Her department is responsible for all customer communications. She explained that GAO's customers consist of its representatives, those working with representatives to coordinate a fundraising program, and consumers of products sold through the fundraising programs. Her department also fields questions concerning each representative's 8000 account balance. She confirmed that Employee was not responsible for his 8000 account balance for his first two years of employment and that GAO later allowed him to write-off his balance for a third year. She identified communications in March 2010 between someone in her department and Employee in which he sought a credit on his 8000 account balance for a bulk buy order that was defective. She confirmed that he was given the credit he requested. She identified two additional payments on his 8000 account, one on June 11, 2008, in the amount of $11,000 and another on June 24, 2008, in the amount of $129.88.

Employee stated that while working for QSP, he met with Jean Laise and Jim Ring in Nashville in January or February 2003 to discuss a potential offer of employment. He stated that at that time, he understood Mr. Ring was fulfilling a leadership role in developing the magazine division, while he believed Ms. Laise would "handle any financial discussions whatsoever with" him and others interested in joining GAO to develop the program. He explained that Ms. Laise had previously filled a similar role at QSP as an executive involved with setting compensation. While he did not sign an employment agreement following the meeting, he believed it was "evident" that he would receive an offer of employment.

Employee asserted that he was specifically told that he would not be held financially responsible for his 8000 account. He explained that he even used his account to help other representatives he trained. He was assured he would "be taken care of" and was promised a guaranteed income, a 25 percent commission on magazine sales, a growth bonus, and a car allowance program, along with other incentives. Other than the initial employment agreement with an attached Pay Plan, he never signed any other documents that set forth the terms of his compensation.

Despite Employee's understanding of the agreement, he received statements documenting his overdraw and 8000 account balance. He questioned Ms. Laise, who told him he was not responsible for the charges.[7] He believed he never had an obligation to remit payment on the 8000 account and stated that he only made the one-time payment of $11,000 because he was threatened with the loss of employment. He explained,

> I paid it because I was forced to pay it. I was told that if I didn't pay it they were going to stop my pay. Basically meaning I wasn't going to have any money. I was going to be fired. I had bills to pay.

He claimed that he was not asked to remit payment on the 8000 account following his payment of $11,000. He then agreed that he received a letter, dated July 14, 2010, in which Kevin Hawley, the Vice President of sales, outlined a plan to reduce his commission and 8000 account balances and directed Employee to return a confidentiality agreement indicating his understanding of the terms of the plan. Employee returned the attached document as directed but inserted the following notation:

> This agreement is for confidentiality purposes only. It does not agree with or imply a dollar figure if any amount owed for draw or 8000 [account].

He received another letter, dated October 26, 2010, in which John Davis, President of GAO, confirmed his receipt of the plan and return of the confidentiality agreement.

Relative to his salary and commission, Employee testified that the Pay Plans did not reflect his actual percentages. He provided that his commission percentages were higher than what was reflected in the Pay Plans until 2008 or 2009 when GAO slowly increased the commission rate for all employees. However, he experienced an income reduction in February 2009, with a decrease of $2,000 per month. He was unsure whether the reduction was applied to his salary or his commission. He identified another letter, dated April 29, 2010, in which he was advised of an additional reduction in salary because his sales had dropped below $30,000.

Employee explained that his production rates went down when he returned to his own territory in his second year with GAO because he had to rebuild his territory. GAO recognized this fact and made accommodations and specifically provided that his written agreement would extend for one more year, at the very least. He explained,

> After my territory was ruined, and after the initial terms of the agreement that they mentioned of two years. That's when they started talking about

---

[7] Contrary to Employee's claim, Mr. Ring testified that Jean Laise was not in a position to change or affect the contract between GAO and its sales representatives.

changing the, I guess, the pay plan. Although they didn't change my pay plan, they started talking about it. And it was like I was beating a dead horse with them, because I kept going back to them, Bill, saying, "You told me I wouldn't be responsible for this. You told me I wouldn't – you told me this, you promised me this." And they did that over and over and over again. And I finally just – as long as they kept my pay the same, I just went along with the version that they were using.

However, Employee claimed that he still remained exempt from remitting payment on his commission and 8000 accounts. He provided,

[T]he magazine team was separate from the rest of GAO reps. It was basically two different programs. They sent that statement out, from what I understand, to everybody. I had a special deal. I didn't have to be responsible for it. But even though I got it, I wanted to confirm that with Jean Laise. She was my person I was in line with. And every time it was the same response, "You will not have to worry about that. We will take care of it."

However, he contested a number of charges on his 8000 account because he wanted the documentation to be an accurate reflection of what he would owe if he were responsible for the balance. He further agreed that "C-prize money" was also applied to his 8000 account balance. He stated,

I never understood that. I never really focused on that. Again, it never really changed my paycheck. When I looked back over all of my paycheck stubs, C-prize never changed my paychecks – my bring home paychecks, one way or the other, and therefore, I didn't really pay it any attention. Because to me it was just a – it was something that they were doing as an accounting function to put this figure and this column, and then swap it over to maybe this column. It didn't mean a thing to me.

He identified an email, dated December 13, 2010, in which he requested an adjustment to his income of $1,500 per month and indicated an assent to his responsibility for his 8000 account balance. However, he claimed,

Please understand, this is the end of the year 2010, whenever they had already started the verbiage with me that this was going to be something that had to be repaid. I argued with them. I argued over and over and over again. It was like beating a dead horse. So I finally caved in and start[ed] using their verbiage. It was certainly – I certainly didn't agree with it.

He identified a later email, dated December 21, 2010, in which he responded to Mr. Ring's offer of an increase of $500 per month. The email provided, in pertinent part, as follows:

> The figures you keep throwing in my face of $140,000 regarding the 8000 Acct. and commission over pay are NOT accurate and we will be addressing these numbers going back to day one. I was on a Guarantee for 3 yrs. These numbers should not be included in the amount you suggest is due. *The 8000 acct. was NEVER part of our deal for the first few when we came over.* That was told to more than one of us that came over. The 8000 acct. should not have BULK BUY numbers on it when it has previously been deducted from our pay. The 8000 acct. should not have charges on it that the rep cannot determine its cause.

(Emphasis added.). He explained that 8000 account charges were not part of the deal for the "first few" *people* who left QSP to start the magazine division at GAO. He claimed that prior to 2010, he was unaware that GAO intended to apply bonuses and other income to his 8000 account balance. He believed that his initial employment agreement afforded him a guaranteed income for at least two years and that the agreement could only be changed by an "executed written document." He provided,

> I had already been told my income would never go down, I didn't have to worry about it. I was the one that came there. It was a good deal for them. I brought them, again, a multi-million dollar product line. And so for them to guarantee me an income for the length of time I was there was a very, very lucrative deal for them.

He explained that his income was not solely based on his production because he had other responsibilities. He agreed that he received the periodic Pay Plans but alleged that he "[t]ossed them to the side" because they did not apply to him.

Relative to the purchase of GAO's stock, Employee claimed that he was told that his stock options could make him a millionaire. He agreed that his ability to purchase stock was dependent upon his sales production. He stated,

> When I sat down with Mr. McDowell, he realized what kind of production I would be producing at QSP. I was one of the leaders at QSP. He knew if I brought my business over to [GAO] that I would be awarded the stock that he showed me, that I would become a millionaire with it.

Once eligible, he paid for his stock through payroll deductions. He purchased approximately $15,000 in stock. He was never provided with a copy of the private offering memorandum or other documentation of the particulars of the stock plan when it was advertised at national sales meetings. He was also never advised that Southwestern could refuse to redeem his stock if he were terminated or resigned from GAO.

Employee stated that he began searching for other employment at some point in late 2010 or early 2011 when he realized he "had no real control over [his] income based on [his] production or [his] performance." He signed a contract of employment with QSP on February 23, 2011, and resigned from GAO on March 2, 2011. He acknowledged that he did not specifically state his liability for the balance held on his commission and the 8000 accounts as reasons for his resignation. He explained that he simply stated that he did not agree with the "changes" implemented by GAO.

Employee identified an email exchange between himself and another GAO employee in which he was advised that GAO would seek reimbursement for his overdraw and 8000 account following his resignation. He responded, in part, as follows:

> I know you were not involved in my hiring process to [GAO], however, there were two individuals that would be considered senior levels of management with GAO that told me that I would not be responsible for the charges, because I was one of the first people to come to GAO from QSP to help start the magazine program. I'm sorry for the misunderstanding on your part, but I was not the only person that this was told to. The agreement that was signed was questioned, and I was told not to worry about it, that it would be taken care of. Once again, I was not the only one told this as well, there are more. I do expect unpaid commissions and bonuses earned by myself during my employment with [GAO].

He asserted that at that time, he believed he did not owe GAO any money in accordance with his initial verbal agreement with GAO representatives, Mr. Ring and Ms. Laise.

Employee testified that his employment with QSP was terminated when GAO acquired QSP in 2012. He then started his own fundraising company but claimed that his attempt to secure American Publishers, another company in the school fundraising business, as a supplier was thwarted by GAO. He believed that American Publishers was the only company capable of fulfilling the order of magazines he needed and claimed that he lost approximately $600,000 in net business as result of his inability to secure American Publishers as a supplier.

Timothy Underwood, GAO's Chief Financial Officer ("CFO"), testified that he has worked for GAO and/or Southwestern for approximately 25 years. He reviewed the financial statements for GAO to determine that less than one percent of GAO's accounts were comprised of 8000 accounts owed by current or former representatives from 2006 through 2007. He noted that the total amount owed was approximately 2 to 3 million, with 1.5 million owed by former representatives.

Mr. Underwood testified that Southwestern owns GAO stock and also owns approximately 14 or 15 other subsidiary companies. He alleged that he had reviewed information about the stock plan for his personal use. He reviewed a private offering memorandum and signed a stock option agreement and subscription agreement prior to making his purchase. He was unaware of any misrepresentations of fact contained in the documents but acknowledged that only 14 people were allowed to sell their stock back to Southwestern from 2010 through 2011. He stated that he was not involved in the issuance of stock because he served as CFO for GAO, not Southwestern.

Brad Patterson testified that he currently operates his own fundraising company, Cloverleaf Fundraising, LLC. He entered the fundraising business in 1988 after he graduated from college. He first served as a field sales manager for QSP and maintained accounts in the Chattanooga area and North Georgia. He also maintained one account in Atlanta – the largest fundraising account in the nation – that was first secured by his father. He remained with QSP until 2003 when he pursued employment with GAO.

Mr. Patterson recalled that several QSP employees, including Jim Ring and Jean Laise, left QSP to develop a magazine division for GAO. Mr. Ring served previously as President of QSP, Canada, while Ms. Laise was a QSP executive in Connecticut. He stated that representatives that were successful in the magazine fundraising business had skills required to market the program. He explained that representatives had to determine which types of magazines to market, when to accept orders, and how to promote sales.

Mr. Patterson first met with GAO in early 2003. His recruitment experience was similar to Employee's in that he met with Mr. Ring and Ms. Laise to discuss his potential employment and then he attended a meeting with Mr. McDowell, who promised a lucrative stock option program. He recalled,

[Mr. McDowell] told me, he said we want to make all of our salespeople millionaires. He said all you've got to do with your business is transfer it over to [GAO] and you'll be a millionaire.

And that – I was just like – he told me about the stock and how it performed since 1982, I believe. It had just continued to go up. And then

- 15 -

he told me that and I was just, wow. I was, like, that's great. That was the high point of my – you know, that I could do what I had been doing with my customers to help them, but yet there was a benefit there like that for my family.

He stated that he was never advised that his stock account could be suspended or that his request for redemption would be denied if he left GAO.[8]

Mr. Patterson stated that he later met individually with Ms. Laise, who discussed his potential compensation.[9] He noted, "I could tell she was the money person." She assured him that his income would not decrease as a result of his decision to leave QSP, that his pay would be based on his current W-2 with QSP, and that they intended to establish a car allowance program similar to the one provided by QSP.

Mr. Patterson testified that he returned a week or two later to discuss his potential employment further. He met with Mr. Ring and Ms. Laise at the hotel across from GAO headquarters. Mr. Ring left shortly after his arrival, while he talked further with Ms. Laise for approximately an hour and a half. He stated,

I was talking to her about the W-2. She said, we're going to put you on this and guarantee you. At the time if you'll help us get this started, this will be your pay. You're going to be training people. You're going to be running a territory. You're going to be doing things to help . . . get this started.

\* \* \*

She said you'll be guaranteed this income and you won't have to worry about it going down. Because you're going to be doing other things for us, not only running your territory, making presentations, traveling with people. All kinds of things.

I said, how long will this last. Are you going to change this[?] She said no, this will be – this is set. It will not change.

---

[8] He began investing in the stock program in 2005. He agreed that he purchased stock from Southwestern, not GAO and that Southwestern owned several different companies. He purchased approximately $38,000 in stock, which was now valued at more than $100,000.

[9] Despite Mr. Patterson's claim, Mr. Ring could not recall Ms. Laise ever meeting with potential recruits on an individual basis.

She also assured him that he would not be responsible for 8000 account expenses. His employment agreement with an attached Notification of Pay Plan executed by Mr. McDowell was consistent with Ms. Laise's assurances concerning his compensation. He identified the periodic Pay Plans provided by GAO to all salespeople at the national sales conferences. The commissions listed on the plans were not what he received from GAO.

Mr. Patterson stated that he contacted Ms. Laise when he began receiving 8000 account statements. She assured him that he was still not responsible for the charges and that the statements were sent solely for accounting purposes. He called her after receiving a few more statements but was again assured that he would not be held responsible for the account. He was not asked to remit payment on the 8000 account until 2008 when Mr. Ring advised him that his employment depended upon a payment of approximately $20,000 within 30 days. He remitted payment in the amount of $14,000 in an attempt to retain his employment. He agreed that his payment did not include any writings or notations indicating that he objected to the amount owed. He was not asked to remit payment on any overdraw until 2010.

Mr. Belli testified that he began working for QSP in 1977. He took a three-year hiatus and worked for Reader's Digest, QSP's parent company, for two years before returning to QSP in 1982. He served as a group product manager for various product lines and became Chief Operating Officer ("COO") in 1984. As COO, he oversaw marketing product development and coordinated with the sales management. He was promoted to President in 1986. As President, he oversaw marketing sales, operations, and public relations and was responsible for the financial health of the company.

Mr. Belli testified that he was asked to resign his position at QSP in February 2000.[10] He remained unemployed until he was hired as Chief Executive Officer[11] of GAO in 2005. He received salary, expenses, and 70,000 shares of stock as part of his employment agreement. He recalled that GAO was housed in the same building as Southwestern, thereby providing a different business culture than what he experienced at QSP. He explained that the "organizational structure was kind of fluid" and that managers might "jump a couple levels and talk to someone above their manager more frequently than at QSP."

Mr. Belli stated that he was specifically hired to assist in the development of the magazine division. Approximately 11 different types of magazine programs were in the beginning stages of development at the time of his hire. He believed the training of the representatives was an important aspect of the viability of such programs because the

---

[10] He resigned from QSP in 1995 to pursue other interests before returning in 1998.

[11] He filled the role of President once Mr. McDowell retired.

programs "should run with a school every year, not occasionally or on a hit-and-miss basis." He explained that "reorienting salespeople who had sold other product lines" was not easy because the "tendency [is to] run a program – move on and run another program at another school, whereas with magazines, it's . . . more service oriented[.]" He provided that those hired to develop the magazine division at GAO

> were primarily responsible for training the other several hundred representatives who [GAO] had employed prior to their arrival.

> That process just involved those experienced representatives riding with the [GAO] veterans and teaching them school by school how the magazine program worked over the course of the time they were together.

Mr. Belli testified that he was responsible for the budget in terms of reviewing and developing compensation programs for the representatives. He acknowledged that GAO maintained "parallel" compensation programs for those he termed GAO veterans and those coming from QSP. He tried to build and ultimately integrate the different systems, and he also worked to develop an incentive program to reduce the balances held on the commission and 8000 accounts. He described the 8000 account as a "catch-all" for expenses, including promotional items ordered through the company. He noted that the 8000 account was a "point of contention" for representatives because "it wasn't always clear what was in the 8000 account." He recalled that "quite a few" representatives spoke with him and expressed concern about his or her 8000 account. He agreed that the accounts were not settled at the end of each year and explained,

> We knew that they had relationships with schools, and that eventually, they would – their commissions would rise to the level that they needed or that they had had prior to coming to [GAO] . . . or rise to the level of the guarantee that they had when they came to [GAO].

> So it was a retention issue, and it was particularly of concern to [Spencer Hays, Executive Chairman of Southwestern *and* CEO of GAO] and others that we . . . retain these people and that they do well. If they weren't functioning well at all, they - - like anyone else, they had to move on, but for those that were . . . working diligently at the business . . . it was allowed to accumulate and move forward.

> In some cases, there was the thought that they would . . . be able to retain more business than they [were and that] would have cut back that overdraw amount, but things happen, recessions and so on, and that put them in a

[place] sometimes in which they could not meet what their expectations were for a particular territory.

He denied ever advising a representative that he or she did not have to reconcile the balance held on a commission or 8000 account. He agreed that it was important to retain representatives but that he assumed that the balances would be reconciled in time. He identified a letter in which he documented a discussion held with Employee concerning a plan to rectify Employee's accounts. He could not recall whether Employee indicated he was not responsible for the balances on his accounts.

Mr. Belli testified that he attended board meetings and was present for discussions concerning the redemption of stock. He stated that funds were taken out of operating capital or profit to redeem stock because Southwestern did not maintain a specific reserve for redemption. He stated that, in general, specific representatives were never "singled out" at board meetings but that a discussion was usually had with respect to whether the company could afford to redeem the stock. He explained that the cash was not available to allow redemption on a yearly basis. He agreed that at times, stock was not redeemed when a "technical issue" was enforced by the board.

Relative to Mr. Belli's individual stock plan, he could not recall whether he ever received a written agreement. He stated that Cindy Johnstone, Vice President and Treasurer of Southwestern and GAO, provided annual reviews of his stock with him individually and with other senior managers. She explained what the stock was worth when it was awarded and how it had grown over a period of time. He later asked for clarification because she retained the reviews and did not provide him with the documents. He understood that following five years of employment, his stock could be redeemed over a five-year period upon his exit from the company. He stated that his initial award of 70,000 shares of stock "trifurcated and became 210,000" shares "a few years" after his initial hire date. He negotiated his stock package with Henry Bedford, CEO and Chairman of the Board of Southwestern *and* GAO. He claimed that the stock plan was a "major" reason for his decision to join GAO but that his understanding of the agreement was later questioned by Mr. Hays in 2010.

Mr. Belli testified that at a meeting in 2010, Mr. Hays advised him that he could earn 210,000 shares if he stayed with GAO for another 10 years. He explained that he believed he had already earned said shares and that Mr. Hays became "perturbed" when he indicated as such in the meeting. He stated,

> [S]uddenly I was confronted with the fact that unlike the rest of my team and everybody else at [GAO] who had received or earned stock, I was being told that the 210,000 shares that I had received and had reviews about

were suddenly being represented to me as something that I would have to earn over the subsequent 10 years.

He stated that he left the meeting "wondering where [he] stood with regard to the stock that I had earned and had been reviewed with me each of the previous years by [Ms. Johnstone and Mr. Bedford]." He continued,

Well, I had been trying to formalize [my agreement] with [Mr. Bedford] for some time, and everybody was being very squirrely about it and never would really meet with me and discuss that.

I can't recall whether I immediately or in the weeks that followed talked to [Mr. Bedford] about it, but I explained to [Mr. Hays] that that's what had happened, and [that] I had never been in a situation like this before.

I had been fortunate in working with the other companies that I work with where promises made were always promises kept, and . . . I was counting on that stock as part of my retirement.

He provided that Mr. Hays advised him that the current offer of 210,000 shares for an additional 10 years of employment was all that was available to him.

Mr. Belli stated that his separation agreement was dependent upon the participation and acquiescence of two other members of the initial team, Jean Laise[12] and Kurt Gengenbach. He explained, "[T]he three of us were lumped together, and if one didn't agree, nobody else would be paid." He ultimately accepted an agreement that was not the amount promised in terms of stock because he believed his failure to accept would "be a hardship" on the other members.

Gregory Toth testified by deposition that he first entered the fundraising business in 1983 when he was hired by Perfect School Plans ("PSP"), which was later purchased by TV Guide Publications in 1985 and then by QSP in 1987. He remained with QSP until he was hired by GAO in 2003.[13] He pursued employment with GAO because the commission rate was higher than at QSP and because the product line offered more than just magazine subscriptions, meaning he could sell discount cards, cookie dough, gifts, and magazines. He discussed his hiring with Mr. Ring and Ms. Laise in Nashville. He

---

[12] He provided that Ms. Laise worked in sales administration at GAO.

[13] He reviewed Employee's contract and stated that he was provided with similar documents, namely the employment agreement and a notification of pay plan, and was paid in a similar fashion. He stated that he never received a second notification of pay plan.

recalled that they claimed that he would receive a two-year guaranteed salary based upon his current commission and salary at QSP. He later met with Mr. McDowell, who advised him that he would also be eligible to participate in the stock plan. He participated in the stock plan once eligible.

Contrary to Employee's testimony, Mr. Toth alleged that the 8000 account was never discussed prior to his hiring and that he did not learn of the account until after his second year working at GAO. He recalled also meeting with Mr. Ring and Ms. Laise to discuss a commission account balance of $20,000. He claimed that Mr. Ring told him "not to worry about it, we'll address it later." Mr. Belli also told him "not to worry" about his commission *and* his 8000 account balances in 2006. Mr. Belli even confirmed this statement in 2007 when Mr. Toth advised him of a competing job offer from QSP in which QSP offered to pay the balance on the 8000 account if he returned to QSP. Mr. Belli offered the same sentiment on two other occasions during passing conversations. Mr. Belli also advised him that his compensation would never be less than what he was provided at QSP. He continued to receive commission and 8000 account statements in the mail, despite the assurances. He was never advised that Southwestern could offset the value of his stock by his commission and 8000 account balances.

Mr. Toth claimed that Mr. Belli later sent a letter outlining an 8000 account reduction plan that required his signature and further provided that he would be personally responsible for any additional expenses once his account reached a specified amount. He was surprised by the letter because it was contrary to his prior discussions with Mr. Belli. He stated that he did not sign the reduction plan based upon his attorney's advice and advised Mr. Davis of his decision. He stated that GAO has not requested payment on his commission or 8000 account since that time but that he has not received further assurances that payment would never be requested. He explained that GAO has automatically applied C-Prize money and bonuses to his balance and has also given him credits against his account for increased sales in accordance with the plan, despite the fact that he never signed the plan or indicated assent to the terms.

Ms. Johnstone testified by deposition that she serves as Vice President, Secretary, and Treasurer of both Southwestern *and* Great American and has served in that capacity for approximately six years. She is responsible for determining who may or may not be eligible for participation in the Southwestern stock plan in accordance with his or her level of sales or profits for GAO. She stated that Employee's sales level in 2004 and 2006 allowed him to participate in the stock plan. She identified Employee's stock summary and other documents pertaining to his 2004 plan, including the private offering memorandum. She testified that she maintains an electronic listing of the offerees for each plan year documenting which memorandum was provided to a particular recipient. She stated that the memorandum would have been mailed to Employee in accordance

with the address on file in the payroll department. She stated that while she presented recipients with disclosures and memorandums, she would not individually determine whether a recipient could bear the economic risk of loss of the entire investment. She assumed that the recipient would consult a financial advisor before electing to participate in the stock plan. She noted that the option agreement, which provided certain representations and warranties made by the optionee, required a signature, while the private offering memorandum did not require a signature. She stated that she provided financial statements to the participants of the stock plan

Ms. Johnstone testified that she had not finalized Employee's account, meaning she had not reconciled Employee's commission and 8000 account and issued a promissory note for the balance due. She stated that once his accounts were finalized, his balance would include the value of the shares he paid for, plus the value of the vested evergreen options, less the cost of the evergreen options.[14] She noted that the fair value of the shares would be determined by the board of directors. She agreed that the private offering memorandum did not contain a disclosure providing that the value of the stock owned by an employee could be offset by the balance owed on the commission and 8000 accounts. She also agreed that the private offering memorandum did not provide the criteria by which the board would determine the fair value of each share. She provided that Southwestern merely held an option to repurchase someone's shares and was not obligated to repurchase the shares.

Mr. Hays[15] testified by deposition that he currently has a business interest in and holds various titles in the following companies: Southwestern, GAO, Tom James Company, and Athlon Sports. He testified in detail concerning his long-time involvement with Southwestern and the creation of GAO. He served as the Executive Chairman of the Board of Directors for Southwestern *and* CEO of GAO. He stated that those coming from QSP to develop the magazine division for GAO were asked to sign a contract indicating that they would honor their non-compete with QSP upon his or her hiring with GAO. He agreed that those employees were also required to divulge their current contacts and territories at QSP to ensure that those contacts and territories were not targeted for sales during the non-compete period.

Relative to Employee's claim regarding the failure of Southwestern to redeem his stock, Mr. Hays testified that the private placement disclosure clearly provides that the company is not obligated to redeem shares. He stated that the Board of Directors for Southwestern decides whether to redeem shares based upon a consideration of a number

---

[14] She provided that an evergreen option allowed an employee to purchase stock once fully vested but that there would be no financial benefit to exercise the option unless the employee was leaving the business.

[15] Mr. Hays passed away during the pendency of this litigation on March 1, 2017.

of factors, including whether such redemption would pose a hardship on the company, whether it is in the best interest of the company, and whether the former employee has harmed the company.  He stated that the Board decided not to redeem Employee's shares based upon the aforementioned factors, specifically because he negatively affected the company by competing and by failing to fulfill his financial obligations.

The trial court failed to issue an opinion within three years following the final day of trial in September 2013.  The Supreme Court advised the trial court, on September 23, 2016, that it would issue a mandamus requiring completion if the court did not issue a ruling by the close of business on September 26.  Thereafter, the court issued a ruling, finding in favor of Employee and providing the following credibility determination:

> [Employee] was not the most polished witness who testified at trial or the witness with the best memory, but the Court finds after observing his demeanor and testing it against the other evidence, that [Employee] was credible, forthright, and consistent in certain core aspects of his testimony.  The Court believes that [Employee] was telling the truth about his expectations at GAO based on representations, the post-hiring representations that he did not have to worry about the Overdraw and 8000 Accounts, and the reasons he made a lump sum payment to GAO.

> The Court concludes that GAO made the representations (primarily through Ms. Jean Laise) to [Employee] that he would not have to pay any outstanding balances that might accrue on his Overdraw and 8000 Accounts and that his salary would never decrease to induce him to come to GAO to work.  [Employee] paid a substantial lump sum on his GAO accounts under threat of discharge.  GAO put him in a position of either paying a lump sum or forfeiting a job that paid substantially more than that annually.  [Employee] chose the former.

In dismissing the breach of contract claim, the court found as follows:

> Here, although GAO is insisting on strict enforcement of its right to recover substantial amounts of money against [Employee] by virtue of [his] 8000 and commission accounts, it failed to take the necessary steps (have the pay plans signed by both parties) to close the loop on this potential contractual right.  The use of the word "executed" in various parts in the Employment Agreement called particular attention to how it was used in various parts of the contract.  Subsequent pay plans prepared by GAO were not in the same form as the original Exhibit "A" to the Employment Agreement in two important ways: 1) the body of the subsequent pay plans were not in the

- 23 -

same form; and 2) the original Exhibit "A" had a place for the parties to sign it. Given that it is undisputed that GAO drafted the Employment Agreement and the original and subsequent pay plans, the Court determines that the original Employment Agreement was never supplemented by legally enforceable pay plans. The Court concludes, therefore, that the original Employment Agreement remained as it was when the Employment Agreement was signed on February 14, 2003 until it was terminated . . . on March 2, 2011.

The court further found that GAO failed to timely reconcile the accounts and assured him that he "did not have to worry" about the 8000 account. The court held that Employee was not liable pursuant to the doctrine of quantum meruit because GAO "never did take the actual steps to close the loop on the version of the employment agreement it is asserting in the lawsuit."

Relative to Employee's counter-complaint, the court held that Employee was entitled to redemption of his stock and ordered GAO to direct Southwestern to pay the current fair market value of the stock. The court noted that GAO had the apparent authority to direct Southwestern to do so because GAO had previously "engaged in conduct that prevented [him] from being able to redeem his stock." The court held that Employee's remaining claims were not cognizable but failed to issue findings of fact in support of its conclusion. This timely appeal followed.

## II.    ISSUES

We consolidate and restate the issues on appeal as follows:

A.     Whether the court abused its discretion in considering statements made by Ms. Laise before and after Employee's hiring.

B.     Whether the court erred in dismissing the breach of contract claim.

C.     Whether the court erred in dismissing the quantum meruit claim.

D.     Whether the trial court erred in ordering GAO to redeem stock purchased from its parent corporation, Southwestern.

E.     Whether the trial court erred in failing to rule on the counter-complaint for intentional interference with prospective business relationships.

- 24 -

## III.    STANDARD OF REVIEW

This case was tried by the court without a jury.  On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them.  *See* Tenn. R. App. P. 13(d).  The trial court's conclusions of law are subject to a de novo review with no presumption of correctness.  *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

In this case, it is necessary to construe the Employment Agreement.  The interpretation of written agreements is a matter of law to be reviewed de novo on the record according no presumption of correctness to the trial court's conclusions of law.  *See Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011).

## IV.    DISCUSSION

### A.

GAO claims that Ms. Laise's statements to Employee were inadmissible hearsay and should not have been considered by the trial court.  GAO provides that the court never issued a ruling on its hearsay objection prior to its issuance of the opinion.  "Generally, the admissibility of evidence is within the sound discretion of the trial court."  *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn.2004).  "The trial court's decision to admit or exclude evidence will be overturned on appeal only where there is an abuse of discretion."  *Id.*  Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted*."  Tenn. R. Evid. 801(c) (emphasis added).  Hearsay is inadmissible in trial court proceedings unless it falls within one of the recognized exceptions to the hearsay rule.  Tenn. R. Evid. 802; *Mitchell v. Archibald*, 971 S.W.2d 25, 28 (Tenn. Ct. App. 1998).

We hold that Ms. Laise's statements were not inadmissible as hearsay because said statements were not offered to prove the truth of the matter asserted, namely that Employee actually had a guaranteed income that would never decrease or that he was not liable for the balance on his commission and 8000 accounts.  Rather, the statements were submitted to prove that assurances were made and to establish Employee's reliance upon the same, despite his receipt of account statements indicating otherwise.

Next, GAO claims that said statements were not binding on GAO when Ms. Laise did not possess the requisite authority to make such statements on its behalf. We find this argument disingenuous. The record reflects that Ms. Laise was an integral part of the hiring process for the QSP employees hired by GAO to develop the magazine division and that she was responsible for developing suggested Pay Plans and offers of employment. Indeed, Mr. Ring stated,

> [Ms. Laise] would put together for me a suggested pay plan based on what they were selling and making at QSP, what they were receiving in terms of any expenses and so forth. Then she would help do all those calculations so that we would know what would be a reasonable offer to make sure these people would be whole when we were giving them guarantees, so she was involved in that part of it too.

Lastly, GAO claims that said statements were not binding and that Employee could not have justifiably relied upon them because the Parties' course of dealing after the alleged statements were made was consistent with the terms of the Pay Plans. We disagree. The record reflects that the yearly Pay Plans were not applicable to Employee until, at the very earliest, the 2008/2009 fiscal year. Following 2008, the 8000 account was not reconciled on a monthly or even yearly basis as provided for in the Pay Plans. The commission account was also not reconciled on a yearly basis. Accordingly, we conclude that the court did not abuse its discretion in considering the statements and assurances made by Ms. Laise.

### B.

GAO argues that the court erred in denying its breach of contract claim when the Employment Agreement was modified pursuant to the Pay Plans that were "comparable in form" as required. GAO claims that the court erroneously read a provision into the contract requiring the parties to sign the Pay Plans. GAO notes that the agreement prohibits a waiver or modification unless it is in writing and signed by the parties. Employee responds that he never signed any of the Pay Plans allegedly incorporated into the original agreement and that the record is devoid of evidence establishing that he received notification of the Pay Plans. He requests reimbursement of his $11,000 payment made under duress and additional damages based upon his justifiable reliance on representations made to him regarding a guaranteed salary.

The cardinal rule of contract interpretation is that the court must attempt to ascertain and give effect to the intention of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In attempting to ascertain the intent of the parties, the court must examine the language of the contract, giving each word its usual, natural, and

ordinary meaning. *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996). "If the language of the contract is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. *Courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made.*" *Pitt v. Tyree Org. Ltd.*, 90 S.W.3d 244, 252 (Tenn. Ct. App. 2002) (internal citations omitted) (emphasis added). However, the court may consider the situation of the parties, the business to which the contract relates, the subject matter of the contract, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms. *See Penske Truck Leasing Co., L.P. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990); *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993).

As pertinent to this appeal, the Employment Agreement provided as follows:

Compensation

(a)     For all services rendered by Employee under this Agreement, [GAO] shall compensate him/her in accordance with the Compensation Schedule which is attached hereto as Exhibit A, and which shall be deemed for all purposes to be an integral part of this Agreement.

(b)     Each fiscal year during the term of this Agreement, [GAO] shall cause to be executed in writing a new Compensation Schedule and Sales Representative's Pay Plan, effective July 1 of the new corresponding year, indicating the amount of compensation and the method for payment of said compensation for the services of Employee during the following fiscal year beginning July 1st. The new Compensation Schedule shall be considered a part of this Agreement and shall be known as Exhibit A for the corresponding year. In conjunction with each new fiscal year, [GAO] will advise Employee of *his/her applicable Pay Plan to be set forth in a written Notification given in accordance herewith comparable in form to the Addendum made a part hereof*.

The terms of the Employment Agreement were not ambiguous; however, the Parties failed to adhere to said terms. The record reflects that the Pay Plans were not "comparable in form" to the original compensation schedule. The Pay Plans relied upon by GAO provided the method of payment but did not set forth the amount of compensation as required by the Employment Agreement. Further, many of the terms contained in the Pay Plans did not apply or were not followed by the Parties. Accordingly, we agree that GAO cannot prevail on its breach of contract claim because the Employment Agreement was never supplemented by legally enforceable Pay Plans.

However, we deny Employee's claim for reimbursement of his lump-sum payment of $11,000 on the 8000 account or any additional damages regarding the use of the commission and 8000 accounts. While the Parties did not operate pursuant to a legally enforceable Pay Plan, Employee acquiesced in his payment of $11,000 and other salary reductions and payroll deductions to reconcile his accounts in exchange for continued employment. He cannot now claim an entitlement to a reimbursement of these funds.

C.

GAO alternatively requests judgment on its quantum meruit claim. GAO again asserts that Employee's reliance upon Ms. Laise's assurances was unreasonable and claims that it did not waive its right to collect when it mailed invoices and statements documenting Employee's balances on the accounts. "Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same." *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966). The terminology is frequently employed "interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties." *Id.* Our Supreme Court summarized the elements of a quantum meruit claim as follows:

(1)    There is no existing, enforceable contract between the parties covering the same subject matter;

(2)    The party seeking recovery proves that it provided valuable goods or services;

(3)    The party to be charged received the goods or services;

(4)    The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and

(5)    The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

*Doe v. HCA Health Servs. of Tennessee, Inc.*, 46 S.W.3d 191, 197-98 (Tenn. 2001) (internal quotation and citations omitted). "The most significant requirement for a recovery on quasi contract is that the enrichment . . . be unjust." *Paschall's, Inc.*, 407

S.W.2d at 155. "The doctrine of unjust enrichment is founded upon the principle that someone who receives a 'benefit desired by him, under circumstances rendering it inequitable to retain it without making compensation, must do so.'" *CPB Mgmt., Inc. v. Everly*, 939 S.W.2d 78, 80 (Tenn. Ct. App. 1996) (quoting *Lawler v. Zapletal*, 679 S.W.2d 950, 955 (Tenn. Ct. App. 1984)).

The circumstances presented here do not indicate that the Parties understood that Employee was liable for the commission and 8000 accounts given Ms. Laise's statements at the time of Employee's hiring and her assurances thereafter. The Parties also did not operate in accordance with the Pay Plans. Further, the circumstances presented here do not support a finding of unjust enrichment when Employee provided specific skills and services to grow the magazine division at GAO while sacrificing his existing sales territory to train others in the business for GAO's benefit. With these considerations in mind, we affirm the denial of GAO's unjust enrichment claims.

D.

GAO claims that the court erred in ordering it to redeem Employee's stock when Southwestern, its parent company, was not a party to the action. GAO notes that Employee never sought redemption of his stock but requested a judgment for consideration paid and interest.[16] Further, GAO argues that Southwestern provided the required disclosures and advised Employee that it had no obligation to redeem the stock. Employee claims that he is entitled to treble damages, punitive damages, and attorney fees because the operation of the stock plan was unfair and deceptive. He further claims that GAO's conduct was willful and knowing as evidenced by its denial of the benefits of stock ownership to others.

We first affirm the denial of any fraud-based claims based upon the purchase and operation of the stock plan because the stock was issued by Southwestern, which was never added as a party to this action. The record also confirms that Southwestern provided the required disclosures and advised Employee that it had no obligation to redeem the stock. The private offering memorandum provided as follows:

---

[16] A review of the counter-complaint reveals that Employee pled sufficient facts to support a claim of redemption and also sought "such other further general relief to which [he] may be entitled." Further, the proof presented at trial supported a claim for redemption. Accordingly, we conclude that the relief granted was within the scope of the pleadings and the proof. *See generally Britt v. Massengill*, No. W1999-01129-COA-R3-CV, 2001 WL 204209, at *3 (Tenn. Ct. App. Feb. 26, 2001) (acknowledging that courts of equity have the authority "to grant relief liberally under the general prayer for relief," within reason).

> If for any reason (including death or disability), an Option holder's employment with the Company is terminated, whether by the Option holder or by the Company, the Company shall have an option to purchase, but is not required to purchase, the Shares of the Option holder.[17]

Additional documentation was also introduced and admitted into evidence establishing that Employee was further advised that Southwestern had no obligation to repurchase the stock upon an employee's termination. We further agree that GAO does not hold the requisite authority to direct its parent company to repurchase the stock and we, therefore, reverse the trial court on this issue. However, Ms. Johnstone testified that Southwestern routinely offset the value of former employees' stock by amounts owed on the commission and 8000 accounts *as indicated by GAO*. Accordingly, we hold that if Southwestern exercises its option to repurchase, then GAO must approve the repurchase without offsetting the value of the stock by amounts allegedly owed on the commission and 8000 accounts in light of our holding that Employee is not liable for the balances held on the accounts.

### E.

Employee claims that the trial court erred in failing to specifically rule on his claim of intentional interference with prospective business relationships. Our Supreme Court listed the elements of such claims as follows:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means . . . ; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citations and footnotes omitted).

Employee testified that his attempt to secure American Publishers, another company in the school fundraising business, as a supplier was thwarted by GAO. He believed that American Publishers was the only company capable of fulfilling the order of magazines he needed and claimed that he lost approximately $600,000 in net business as result of his inability to secure a capable supplier. In support of his argument on

---

[17] The Company is defined as Southwestern.

- 30 -

appeal, Employee cites a letter sent by Mr. Hayes to American Publishers. This letter was not admitted at trial. Further, the court granted a motion in limine to exclude statements classified as hearsay concerning the reason American Publishers refused to serve as his supplier. The record is simply devoid of evidence to establish this claim. Accordingly, we affirm the denial of this claim.

## V.     CONCLUSION

The judgment of the trial court is reversed, as to the court's holding regarding the stock account. The judgment is affirmed in all other respects. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed one-half to the appellant, Great American Opportunities, Inc. and one-half to the appellee, James Brigman.

_____
JOHN W. McCLARTY, JUDGE